United States District Court
Eastern District of New York
Brooklyn Division

| Federal Trade Commission,<br><br>  Plaintiff,<br><br>v.<br><br>Instant Response Systems, LLC, a limited liability company, also d/b/a Response Systems, B.B. Mercantile, Ltd., Medical Alert Industrial, and Medical Alert Services, and<br><br>Jason Abraham, a/k/a Yaakov Abraham, individually and as an officer of Instant Response Systems, LLC, also d/b/a Response Systems, B.B. Mercantile, Ltd., Medical Alert Industrial, and Medical Alert Services,<br><br>  Defendants. | CV 13-0976<br><br>**Complaint for Permanent Injunction and Other Equitable Relief**<br><br>[Filed Under Seal]<br><br>GLASSER, J.<br><br>SCANLON, M.J. |
|---|---|

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act, ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Unordered Merchandise Statute, 39 U.S.C. § 3009, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Unordered Merchandise Statute, 39 U.S.C. § 3009.

1

### Jurisdiction and Venue

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b) and (c).

### Plaintiff

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act. In accordance with the Telemarketing Act, the FTC promulgated and enforces the TSR, which prohibits deceptive and abusive telemarketing acts or practices. In addition, the FTC enforces the Unordered Merchandise Statute.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, and the Unordered Merchandise Statute, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

### Defendants

6. Instant Response Systems, LLC, also d/b/a Response Systems, B.B. Mercantile, Ltd., Medical Alert Industrial, and Medical Alert Services is a limited liability company with its principal place of business at 1601 East 18th Street, Brooklyn, New York 11230. Instant Response Systems initiates outbound telephone calls to induce consumers to purchase goods or

services, and transacts or has transacted business in this District and throughout the United States.

7. Jason Abraham, a/k/a Yaakov Abraham, is the organizer of Instant Response Systems. He resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Instant Response Systems, including the acts and practices set forth in this Complaint.

### Commerce

8. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

### Defendants' Business Activities

### Defendants' Sales Pitch

9. Instant Response Systems telemarketers have placed unsolicited calls throughout the United States to elderly consumers to sell medical alert services. Typically, the consumers are over the age of 70, live alone, and have limited or fixed income. Many of them are in poor health and rely on family members, friends, or health professionals to manage their finances and make financial or health-related decisions for them.

10. In addition, in numerous instances, Instant Response Systems has placed calls to consumers who have their phone numbers listed on the National Do Not Call Registry.

11. Telemarketers begin the calls by claiming that they are calling in response to a request for information about medical alert services by the consumers or their loved ones.

3

Consumers often report, however, that they did not request such a call and do not know how the telemarketers obtained their phone numbers.

12. Then, the telemarketers explain that the medical alert service consists of a pendant that enables the consumers to receive help during emergencies. According to the telemarketers, if purchasers push a button on the pendant, they will reach a 24 hour-a-day, 7 days-a-week monitoring service that will assess the consumers' emergency and contact the necessary parties to help, such as the police, fire department, or the consumers' relatives.

13. The telemarketers then ask a series of health-related questions aimed at instilling fear of serious medical emergencies in the consumers. For example, telemarketers ask consumers questions such as:

> Have you ever fallen down?
> Do you have dizzy spells?
> Have you ever had a heart attack?
> How long did you . . . lie there before being found?
> Have you ever had a stroke?
> How long did you . . . lie there before being found?
> What would happen if you . . . were NOT found quickly?
> What will happen if you try to get to a telephone?
> When you recover from a heart attack, stroke, or accident, would you rather come home, or go to a nursing home?

14. After compiling answers to the questions, the telemarketers assure consumers that the medical alert service will provide 24-hours-a-day, 7-days-a-week protection.

15. The telemarketers then tell consumers that they must have a checking account if they wish to order the service and claim that the cost of the service ranges from approximately $817 to $1,602, which consumers can pay through various payment plans that supposedly depend on the consumers' financial situation, such as whether they are on a fixed income or receive monthly pension or disability benefits. They further claim that the monitoring is free.

16. The telemarketers then ask consumers for the names and phone numbers of several friends or relatives to contact during an emergency and a mailing address to which the medical alert pendant could be shipped.

17. In numerous instances, consumers who telemarketers have called did not order medical alert services from Instant Response Systems.

### Defendants' Dunning Notices

18. In numerous instances, Instant Response Systems has misrepresented that consumers have ordered its medical alert service to induce payment for the service. The company has sent letters to consumers who did not order or agree to order the service claiming that the consumers purchased the service and owe money for it.

19. For example, Instant Response Systems sent a letter to a consumer who did not order the service, stating:

> Congratulations! In a few short days you will receive your monitoring system and have unlimited use of our medical alert system including repair or replacement as needed.
>
> \*     \*     \*
>
> As you agreed in our conversation, please send a check for $1196 in the enclosed stamped envelope.
>
> \*     \*     \*
>
> NOTE: We ask that you send your payment NOW so that we can ship your lifesaving system to you immediately.
>
> \*     \*     \*
>
> Usually you would be charged $242 for processing, programming, handling, packaging, and/or shipping. However, if you pay for the system according to the above terms, you do NOT have to pay this $242.

5

> WARNING: If a payment is not honored by the bank <u>for any reason</u>, [you] will be charged a $75 "bounced" fee, the payment due, and possibly the waived $242.

\* \* \*

> Your system should arrive in a few business days after we receive your payment.

20. Instant Response Systems has also sent packages containing medical alert pendants to consumers who did not order or want the service. Frequently, consumers have refused to accept the packages or returned them unopened in the mail.

21. In numerous instances, Instant Response Systems has used threats and intimidation against consumers to coerce payment for its medical alert service. It has sent letters and bogus invoices to consumers who did not order the service, accusing the consumers of receiving the company's medical alert pendant without paying for it and threatening them with civil and criminal legal action if they do not immediately pay. The letters direct consumers to pay by check, or to call the company if they want to make other payment arrangements or ask questions.

22. For instance, in a letter to a consumer who told Instant Response Systems that she did not order the service despite being harrassed by one of the company's telemarketers into providing bank account information, Instant Response Systems charged:

> You gave us your banking information by telephone and authorized us to use it to collect your promised payment. However, when we submitted the payment to your bank, it "bounced."

\* \* \*

> You have embarrassed us and damaged our reputation. We had to pay bank fees, in addition to accounting, manpower, and other

6

> costs. We will NOT absorb these costs or pass them on to our paying subscribers.

*   *   *

> We suggest that you consult an attorney and ask about the criminal and civil consequences of bouncing checks.

23. In addition, Instant Response Systems sent a letter that included a fictitious police report to another consumer who did not order the service but was pressured by an Instant Response Systems telemarketer into providing bank account information. The letter issued the following warning:

> Unless you send what you owe and return, or pay for the equipment immediately, we have no choice but to consider the equipment as STOLEN. To pay for the stolen equipment, insurance companies require a police report be filed. (See enclosed copy of "STOLEN PROPERTY POLICE DEPARTMENT FORM" completed and ready to be filed.)

*   *   *

> This is your LAST chance to pay what you owe.

24. On many occasions, Instant Response Systems representatives have repeatedly placed follow-up calls to consumers and left messages on the their answering machines insisting that the consumers call a toll-free number as soon as possible in order to make payment arrangements.

25. When consumers try to contact Instant Response Systems to dispute the false charges or request instructions to return the unordered and unopened packages, they often are either unable to reach anyone, or they speak with representatives who renew false accusations that the consumers ordered the medical alert service, admonish them to pay Instant Response Systems immediately or face legal consequences, and verbally abuse and intimidate them. For

7

example, when some consumers have tried to protest the trumped-up charges, a representative named "Ruby Wilson" has scolded them for allegedly ordering the medical alert service and not paying for it and shouted menacingly that Instant Response Systems was preparing to sue them unless they paid immediately. In addition, relatives, friends, or aides of consumers who tried to intervene on the consumers' behalf have reported that, on multiple occasions, "Ruby Wilson" rudely refused altogether to speak with them.

### Jason Abraham's Role

26. Jason Abraham is the architect of Instant Response Systems and orchestrated much of the company's business activities, including organizing and creating the company, posting job classified ads to recruit telemarketers, shipping medical alert pendants, and setting up and paying for telephone numbers used in the scheme. He has also established and maintained bank accounts on behalf of Instant Response Systems.

27. Jason Abraham is jointly and severally liable for the conduct of Instant Response Systems because he has the authority to control and direct the company's activities; has participated in those activities; and has had knowledge of the company's misrepresentations and other misconduct.

### Violations of the FTC Act

28. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

29. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

8

## Count I

### Misrepresentations to Induce Payment for Defendants' Goods or Services

30. In numerous instances, in connection with the marketing of medical alert services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers have ordered, purchased, or agreed to purchase Defendants' medical alert services, and therefore owe money to Defendants;

31. In truth and in fact, in numerous instances, consumers have not ordered, purchased, or agreed to purchase Defendants' medical alert services, and therefore do not owe money to Defendants;

32. Therefore, Defendants' representation, as set forth in Paragraph 30 of this Complaint, is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### **Violations of the TSR**

33. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108 in 1994. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

34. It is a deceptive telemarketing act or practice, and a violation of the TSR, for any seller or telemarketer to make a false or misleading statement to induce a person to pay for goods or services or to induce a charitable contribution. 16 C.F.R. § 310.3(a)(4).

35. It is an abusive telemarketing act or practice, and a violation of the TSR, for any seller or telemarketer to engage in the use of threats, intimidation, or profane or obscene language. 16 C.F.R. § 310.4(a)(1).

36. The 2003 amendments to the TSR established a do-not-call registry, maintained by the Commission (the "National Do Not Call Registry" or "Registry"), of the phone numbers of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at *donotcall.gov*.

37. Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call, or over the Internet at *donotcall.gov*, or otherwise by contacting law enforcement authorities.

38. Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(u).

39. The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

40. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

41. Defendants are sellers and telemarketers engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2(aa),(cc), and (dd).

42. Since at least 2008, Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of medical alert services by use of one or more telephones and which involves more than one interstate telephone call.

### Count II

### Making False or Misleading Statements to Induce Payment in Connection with Telemarketing

43. In numerous instances, in the course of telemarketing medical alert services, Defendants have made false or misleading statements, directly or by implication, to induce consumers to pay for goods or services, including, but not limited to, the misrepresentation described in Paragraph 30.

44. Defendants' acts and practices, as described in Paragraph 43, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(4).

### Count III

### Threats or Intimidation

45. In numerous instances, in the course of telemarketing medical alert services, Defendants have used threats or intimidation to coerce consumers to pay Defendants.

46. Defendants' acts and practices, as described in Paragraph 45, are an abusive telemarketing act or practice that violate the TSR, 16 C.F.R. § 310.4(a)(1).

### Count IV

### Calling Consumers on the National Do Not Call Registry

47. In numerous instances, in connection with the telemarketing of medical alert services, Defendants have engaged in, or caused others to engage in, initiating an outbound

11

telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## Violations of the Unordered Merchandise Statute

48. The Unordered Merchandise Statute, 39 U.S.C. § 3009, generally prohibits mailing unordered merchandise, unless such merchandise is clearly and conspicuously marked as a free sample, or is mailed by a charitable organization soliciting contributions. The statute also prohibits mailing consumers bills for unordered merchandise or dunning communications.

49. In accordance with Section (a) of the Unordered Merchandise Statute, 39 U.S.C. § 3009, a violation of the Unordered Merchandise Statute constitutes an unfair method of competition and an unfair trade practice, in violation of Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

## Count V

## Mailing and Billing for Unordered Merchandise

50. In numerous instances, in connection with the marketing of medical alert services, Defendants, who are not a charitable organization soliciting contributions, have shipped medical alert pendants to consumers without the prior express request or consent of the recipients, or without identifying the pendants as free samples, thereby violating subsection (a) of the Unordered Merchandise Statute, 39 U.S.C. § 3009.

51. In numerous instances, in connection with the marketing of medical alert services, Defendants have mailed to the recipients of such services one or more bills or dunning communications for such services, thereby violating subsections (a) and (c) of the Unordered Merchandise Statute, 39 U.S.C. §§ 3009(a) and (c).

52. Defendants' practices, as alleged in Paragraphs 50 and 51, are therefore unfair trade practices that violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

### Consumer Injury

53. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, TSR, and Unordered Merchandise Statute. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

### This Court's Power to Grant Relief

54. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

55. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

### Prayer for Relief

Therefore, Plaintiff, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C.

§§ 53(b) and 57b; Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b); the Unordered Merchandise Statute, 39 U.S.C. § 3009; and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, and a financial accounting;

B. Enter a permanent injunction to prevent future violations of the FTC Act, TSR, and Unordered Merchandise Statute by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, TSR, and Unordered Merchandise Statute, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

David C. Shonka
Acting General Counsel

Dated: 2/25/13

Arturo A. DeCastro
Federal Trade Commission
600 Pennsylvania Avenue, NW, H-286
Washington, DC 20580
Phone: (202) 326-2747
Fax: (202) 326-3395
Email: adecastro@ftc.gov

Attorney for Plaintiff
Federal Trade Commission