UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
FEDERAL TRADE COMMISSION,

              Plaintiff,

    - against -

INSTANT RESPONSE SYSTEMS, LLC, and
JASON ABRAHAM,

              Defendants.
----------------------------------------------------x

MEMORANDUM AND ORDER

13 Civ. 00976 (ILG) (VMS)

GLASSER, Senior United States District Judge:

Plaintiff, the Federal Trade Commission ("FTC"), brings this action against

Instant Response Systems, LLC ("IRS") and Jason Abraham ("Abraham," collectively,

"Defendants"), alleging that Defendants violated Section 5(a) of the Federal Trade

Commission Act ("FTC Act"), codified at 15 U.S.C. § 45(a); the Telemarketing Sales Rule

("TSR"), 16 C.F.R. §§ 310.1–310.9; and the Unordered Merchandise Statute ("UMS"), 39

U.S.C. § 3009.  The FTC moves, pursuant to Federal Rule of Civil Procedure 56, for

summary judgment.  For the reasons that follow, the motion is GRANTED.

## BACKGROUND

### I.  Factual Background

The following facts are undisputed.[1]  Abraham is the founder, owner, and chief

executive officer ("CEO") of IRS, a registered New York Limited Liability Company

---

[1] Abraham filed a "Rebuttal" to the FTC's Rule 56.1 Statement, which does not comply with Local Civil Rule 56.1—it does not include "correspondingly numbered paragraph[s] responding to each numbered paragraph in the [FTC's Rule 56.1 Statement]," or cite to admissible evidence to support each statement. See L. Civ. R. 56.1.  Given that Abraham appears pro se, the Court declines to accept all facts in the FTC's Rule 56.1 Statement as admitted; instead, it will consider the "totality of the parties' submissions in identifying disputed material facts."  See FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 302-03 (S.D.N.Y. 2008).  The Court, however, exercises its discretion to excuse Abraham's failure only to the extent he has provided admissible evidence controverting the facts in the FTC's Rule 56.1 Statement.  See Mateo v. Bristow, No. 12 Civ 5052, 2014 WL 4631569, at *1 (S.D.N.Y. Sept. 17, 2014).

located in Brooklyn, New York.  FTC's Local Rule 56.1 Statement of Facts ("FTC SOF")
¶¶ 1-2.  At the time Abraham founded IRS in March 2008, he was subject to a
permanent injunction issued by the United States District Court for the District of
Columbia on December 1, 2003.  Id. ¶ 5.  The injunction—the product of a 2003 FTC
lawsuit against him for selling fraudulent identification documents and academic
degrees—permanently banned him from making material misrepresentations in the sale
of any goods or services.  Id.; Plaintiff's Exhibit ("PX") 7.

IRS sells a medical alert monitoring service and equipment to the elderly.  FTC
SOF ¶¶ 8, 16-17.  The equipment includes a pendant with a button that connects
consumers to emergency dispatchers.  Id. ¶¶ 16-17.  As CEO of IRS, Abraham leads
virtually all aspects of the business, including hiring, training, overseeing, and firing
employees, and managing corporate finances.  Id. ¶¶ 55-71, 73-90.  Shortly after forming
IRS, Abraham recruited and hired telemarketers via online ads.  Id. ¶ 74.  He also hired
two key employees:  Leticia Dumitras, who handled payroll and data entry (id. ¶ 88),
and Lori Kennegeisser,[2] who handled billing and collections.  Id. ¶ 83.

A.  IRS Telemarketing Calls

IRS telemarketers used lists of customer phone numbers, or "leads," which
Abraham obtained from paid lead generators in the Philippines.  Id. ¶¶ 69, 74.  Abraham
testified that he did not take any steps to confirm whether the lead generators were
filtering out numbers listed on the National Do Not Call Registry.  Id. ¶ 12; PX 11 at
82:4-7.  IRS' telemarketing targeted primarily consumers over the age of 64, who lived
alone, and had a limited or fixed income.  FTC SOF ¶¶ 8-9, 106.

---

[2] The FTC has spelled Ms. Kennegeisser's name differently in prior submissions to the Court.  See, e.g.,
Dkt. No. 30.  For consistency, the Court adopts the spelling used in the FTC's summary judgment motion.

Using a scripted sales pitch, telemarketers falsely told consumers that they were calling in response to a request for information about medical alert services.  Id. ¶ 14; PX 1 at 64:13-65:1.  Some consumers were told that a family member or loved one asked IRS to contact them.  FTC SOF ¶ 14.  After describing the medical alert equipment and monitoring service (id. ¶ 15), telemarketers told consumers that they could order either a lifetime monitoring service, which cost $1,128, or a three-year service, which cost $128 plus $36 per month.[3]  Id. ¶ 22.  Consumers were required to provide their bank account information to place an order.  Id. at ¶ 24.  Defendants used the Automated Clearing House—a system for transferring funds electronically—to withdraw money from the consumers' accounts.  PX 1 at 113:18-118:3.  To create a paper trail of the transaction, an IRS employee would enter the consumer's bank account information into a check template.  Id. at 114:4-19.  The check did not bear the consumer's signature; instead it would display the consumer's name and state that the consumer authorized the transfer.  Id.; PX 14 at 6 (FTC-IRS_000108).  Abraham would sign the checks, which were then deposited into company bank accounts.  PX 1 at 114:4-19; FTC SOF ¶ 26.

IRS telemarketers called consumers who never requested information about medical alert services.  Id. ¶ 10.  They also called consumers whose phone numbers were on the National Do Not Call Registry, and who did not give IRS prior written authorization for the calls.  Id. ¶¶ 11-12.

B.  Misrepresentations and Threats to Consumers

---

[3] During the initial sales pitch, the telemarketers pressured consumers who said they did not wish to order the services.  For instance, if the consumer expressed an unwillingness to purchase the services, the telemarketer was instructed to deliver the following message: "It appears that you don't really want to protect yourself.  Tragically, you'll only know how much you needed the system only after you're lying in a nursing home – and it's too late. . . .You seem intelligent, but only a very foolish person would reject this offer.  But – what can I do. [Wait – they may change their minds!]."  PX 8 at 13.

Many consumers who did not order the medical alert services nevertheless received sales invoices from IRS.  Id. ¶¶ 31-32.  These invoices often stated: "As you agreed in our conversation, please send a check for $1,196 in the enclosed stamped envelope. . . .We ask that you send your payment NOW so that we can ship your lifesaving system to you immediately."  Id. ¶ 32 (emphasis in original).  Other consumers received merchandise from IRS that they never ordered.  Id. ¶ 33.

When these consumers refused to pay, IRS sent follow-up letters that flagrantly accused them of ordering their services and demanded immediate payment.  Id. ¶¶ 36-39.  These letters, written by Abraham under a variety of aliases, urged consumers to "consult an attorney" about "the criminal and civil consequences of bouncing checks," and advised that "if a lawsuit is filed against you and you lose, you could be libel [sic] for thousands of dollars to pay the amount awarded, court costs, attorney fees, and/or punitive damages, in addition to your own attorney costs."  PX 32.1 at 19 (FTC 00243); FTC SOF ¶¶ 92-93, 96.  Other letters admonished: "You ought to be ashamed and embarrassed!"  PX 32.1 at 47 (FTC 00271); see also PX 13 at 12; PX 16 at 12; PX 19 at 16.  One consumer testified that she received a letter stating that if she did not pay for the unordered merchandise that she received, it would be considered "STOLEN."  Id. ¶ 41 (emphasis in original).  The letter attached what it claimed was a "Stolen Property Police Department Form" that was "completed and ready to be filed."  Id.  That consumer had attempted to return the merchandise but was unable to do so for over four months because IRS representatives would not provide a return address.  PX 17 ¶¶ 7-10.

In addition to the letters, some consumers received repeated follow-up calls from IRS telemarketers seeking payment for services that they never ordered.  FTC SOF ¶ 44.  One consumer who initially declined to order the services eventually provided her bank

account information just to stop a persisting telemarketer from calling her.  Id. ¶ 29.

Another consumer who did not order the services testified that telemarketers left

multiple messages on her answering machine, claiming that her credit was in jeopardy if

she did not call IRS immediately.  Id. ¶ 45; PX 12.  Many consumers reported

threatening calls from Kennegeisser, who at times used the alias "Ruby Wilson."  FTC

SOF ¶¶ 47-50.  Kennegeisser told one consumer who did not order the services that she

was an attorney and threatened to have the consumer arrested if she did not pay IRS

immediately.  Id. ¶ 48.

Abraham personally reviewed and responded to over 100 consumer complaints.

Id. ¶¶ 99-100.  He also fired at least "two or three" employees for being abusive to

consumers.  Id. ¶ 101; Abraham's Rebuttal to the FTC's Rule 56.1 Statement of Facts

("Abraham SOF") at 56-57.  Between 2008 through February 2013, the FTC and the

New York Attorney General's Office received approximately 131 consumer complaints

about IRS' sales practices.  FTC SOF ¶¶ 105-106.  In 2012, the New York Attorney

General's Office investigated IRS and obtained a sworn affidavit from Abraham

regarding his involvement in the company's activities.  Id. ¶ 103.

Abraham testified that IRS' reported gross revenue from 2009 through February

2013 was over $3.4 million.  Id. ¶ 53; PX 1 at 182:10-25; 190:19-21; 211:8-217:8.

Pursuant to the Preliminary Injunction issued by the Court on March 15, 2013, the FTC

has frozen several of Abraham's bank accounts at TD Bank with balances totaling

$1,483.  Id. ¶ 107.

## II.  Procedural Background

On February 25, 2013, the FTC filed its Complaint against Abraham and IRS for

violations of Section 5(a) of the FTC Act, the TSR, and the UMS.  Dkt. No. 1.  That same

day, the Court granted a Temporary Restraining Order against Defendants (Dkt. No. 10), and on March 15, 2013, entered a Preliminary Injunction against Defendants.  Dkt. No. 19.  On June 6, 2013, Defendants' attorney withdrew from the case (Dkt. No. 24), and on July 24, 2013, Abraham, appearing pro se, filed an Answer on his own behalf. Dkt. No. 28.  After Abraham failed to retain counsel for IRS, on January 31, 2014, the Court granted a default judgment and issued an order for a permanent injunction and monetary relief of $3,432,462 against IRS.  Dkt. No. 65.

On June 6, 2014, the FTC filed its Motion for Summary Judgment against Abraham on all counts of its Complaint.  Dkt. No. 70.  The Motion seeks an order for injunctive and monetary relief.  Abraham filed his Memorandum of Law to Strike the FTC's Motion for Summary Judgment ("Response") on July 24, 2014.[4]  Dkt. No. 74.[5] The FTC filed its Reply in Support of its Motion for Summary Judgment on August 15, 2014.  Dkt. No. 73.  On November 12, 2014, the Court held a status conference regarding the FTC's proposed order for a permanent injunction and monetary judgment against Abraham.  Dkt. No. 75.  In response to the Court's request, the FTC submitted a revised proposed order for a permanent injunction and monetary judgment on December 3. Dkt. No. 76.  The Court permitted Abraham to file a Supplemental Response to the FTC's motion papers ("Abraham Supp."), which he filed on December 9.  Dkt. No. 77. On December 15, the FTC submitted a Reply in Opposition to Abraham's Supplemental Response ("Supp. Reply").  Dkt. No. 78.

## DISCUSSION

---

[4] Although Abraham uses the word "strike" in the title of his brief, the Court assumes this is an error and will consider the submission as a response memorandum in opposition to the FTC's summary judgment motion.

[5] The document was not entered into the ECF system until August 19, 2014.

## I.   Legal Standard

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Summa v. Hofstra Univ., 708 F.3d 115, 123 (2d Cir. 2013). A dispute about a material fact is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record" such as depositions, affidavits, admissions, or other documentation. See Fed. R. Civ. P. 56(c)(1)(A); see also Kelly v. Signet Star Re, LLC, 971 F. Supp. 2d 237, 243 (D. Conn. 2013) (non-moving party must present affirmative evidence to defeat properly supported summary judgment motion). "[U]nsupported allegations do not create a material issue of fact," Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), and "[c]onclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003). The non-moving party also cannot rely on "mere assertions that affidavits supporting the motion are not credible." See Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). "When no rational jury could find in favor

of the non-moving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## II.  Analysis

The FTC moves for summary judgment on all five counts in its Complaint.  Count One asserts a violation of Section 5(a) of the FTC Act based on Defendants' alleged misrepresentations that consumers ordered medical alert services and owed money to Defendants.  (Compl. ¶¶ 30-32).  Counts Two, Three, and Four allege violations of the TSR, 16 C.F.R. §§ 310.1–310.9, based on Defendants' alleged misrepresentations to induce consumers to pay for the IRS services, (Compl. ¶¶ 43-44); Defendants' use of threats or intimidation to coerce consumers to pay them (id. ¶¶ 45-46); and Defendants' calls to consumers whose numbers appear on the National Do Not Call Registry (id. ¶ 47).  Count Five alleges that Defendants mailed unordered merchandise to consumers in violation of Section 3009(a) and (c) of the Unordered Merchandise Statute, 39 U.S.C. § 3009, (Compl. ¶¶ 50-52).

### A.  Evidentiary arguments

As an initial matter, the Court addresses Abraham's objections to evidence the FTC submitted in support of its motion—namely, seven sworn declarations from the caretakers of elderly consumers who were contacted by IRS, and 131 Better Business Bureau ("BBB") complaints.  His argument that the evidence is inadmissible as hearsay is without merit and irrelevant.[6]  See Response at 4-5; 55-56.  The FTC correctly argues

---

[6] His attacks on the credibility of the caretakers are equally meritless:  "Mr. Budd allows his 91 year old mother to live alone in another town.  This is more dangerous than anything of which IRS has been accused.  Mr. Budd's testimony is not to be believed."  Response at 35.  "If one's elderly parent is unable to make rational decisions, as the relatives frequently claim, permitting that person to live alone is negligent,

that the evidence is admissible under Federal Rule of Evidence 807, the "residual exception" to the hearsay rule.  Rule 807 allows parties to use statements that would otherwise constitute hearsay if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) is offered as evidence of a material fact; (3) is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of [the Federal Rules of Evidence] and the interests of justice;" and (5) "the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it."  Fed. R. Evid. 807.[7]

The caretakers' declarations—hearsay only to the extent they are offered to prove the truth of the statements made to the elderly consumers—recite similar and consistent factual accounts about the consumers' experiences with IRS and the misrepresentations at issue.  In particular, they describe the letters and phone calls demanding payment for unordered services and the threatening calls from IRS telemarketers.  The declarations are also corroborated by letters and invoices from IRS that other consumers have provided, which reinforces their trustworthiness.  Finally, it would be unduly wasteful of time and burdensome for the FTC to call each aggrieved consumer to testify, and the interests of justice are therefore best served by using the caretakers' declarations.  See Fed. R. Evid. 807.

---

dangerous, life threatening behavior.  I contend that a person of such low moral character cannot be relied upon as a witness in a court of law."  Id. at 5.

[7] The parties do not dispute whether there was adequate notice.  The FTC produced the BBB complaints during discovery and submitted the declarations over a year ago as exhibits to its Motion for a Temporary Restraining Order.  See Dkt. Nos. 21-23; Fed. R. Evid. 807(b).

The BBB complaints are also admissible under Rule 807 given their inherent "guarantees of trustworthiness" as corroborating reports of the Defendants' misrepresentations, which were sent spontaneously by unrelated individuals to a government agency.  See FTC v. Magazine Solutions, LLC, Civil Action No. 7-692, 2009 WL 690613, at *1 (W.D. Pa. Mar. 16, 2009) (admitting consumer complaints to BBB in part because "[t]he consistency of the representations" described in consumers' letters reinforced the trustworthiness of the complaints).  Furthermore, "reasonable effort would not produce evidence that is more probative" than contemporaneous reports of Defendants' misconduct, and admitting the BBB complaints will therefore best serve the interests of justice.  See FTC v. Figgie Int'l Inc., 994 F.2d 595, 608-09 (9th Cir. 1993); see also FTC v. Cyberspace.com, Civ. No. 1806, 2002 WL 32060289 (W.D. Wa. July 10, 2002) (quoting Figgie and admitting emails and letters of complaint under Rule 807), aff'd, 453 F.3d 1196 (9th Cir. 2006).

B.  Section 5(a) of the FTC Act

Count One alleges a violation of Section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  To prove a deceptive act or practice under Section 5(a), the FTC must prove three elements: (1) a representation, omission, or practice, (2) that is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material.  FTC v. Verity Int'l, 443 F.3d 48, 63 (2d Cir. 2006).  Express claims that are shown to be false are presumed material.  See Med. Billers, 543 F. Supp. 2d at 304.  "The deception need not be made with intent to deceive; it is enough that the representations or practices were likely to mislead consumers acting reasonably."  Verity, 443 F.3d at 63 (citing FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)).

There is no genuine dispute that Defendants, in letters and phone calls, made material misrepresentations that consumers ordered medical alert services and owed IRS money when, in fact, they did not.  The FTC has submitted sworn declarations from consumers (or their caretakers) who received letters or phone calls from IRS, accusing them of owing money for a medical alert system that they never ordered.  Additionally, the FTC submitted BBB complaints from consumers making similar allegations.

In response, Abraham argues that Defendants made no material misrepresentations because the complaining consumers did order the services and their complaints are "feeble attempts . . . to avoid paying their debts legitimately owed to IRS."  Response at 4.  He contends that the existence of an internal Subscriber Identification Number ("SIN") assigned to each complaining consumer's alleged order "proves that [the consumer] subscribed and agreed to pay," and "IRS would not have billed . . . for the equipment had [the consumer] not subscribed and agreed to pay."  Abraham SOF at 13.  Other than his saying so, he presents no admissible evidence to show that the complaining consumers actually subscribed and agreed to pay for the services.

As the sole evidentiary support for his assertion, Abraham submitted an unsworn affidavit from Dumitras (see Written Testimony of Leticia Dumitras, Dkt. No. 74 at 123, ("Dumitras Testimony")), which was not signed under penalty of perjury and is thus inadmissible.  See, e.g., United States v. All Right, Title & Interest in Real Prop. & Appurtenances, 77 F.3d 648, 657-58 (2d Cir. 1996) ("[T]he submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the

factual assertions made in that letter were properly disregarded by the court").[8]  And
even if it were admissible, it fails to satisfy Rule 56(c)(4)'s requirement that affidavits
used to oppose summary judgment must be "made on personal knowledge" and "set out
facts that would be admissible in evidence."  As an independent contractor for IRS who
handled payroll and data entry, Dumitras lacks personal knowledge of the consumer
complaints or the calls at issue.  See PX 1 at 13:5-25.  Her job did not involve
communicating with consumers; rather, she received consumer names from IRS
telemarketers and then assigned them SIN numbers.  See Dumitras Testimony at 7:8-14.
And although she allegedly listened to "dozens" of calls with consumers, she does not
state whether she listened to calls between IRS agents and the complaining consumers.
See Response at 38.  Notably, Abraham does not provide affidavits from the
telemarketers who spoke with consumers—most importantly, Kennegeisser.[9]  He states
repeatedly that all calls with consumers were recorded, but provides not a single record
of them.

Finally, Abraham's attacks on the complaining consumers—for example, that one
consumer who submitted a declaration "obviously has serious ethical and/or mental
issues from which the public should be protected" (Abraham SOF at 33)—amount to
nothing more than "mere assertions that the affidavits supporting the [FTC's] motion
are not credible," which cannot defeat the FTC's motion for summary judgment.  See

---

[8] Abraham states in his Supplemental Response that although he submitted a signed and notarized hard
copy of Dumitras' testimony, the testimony filed electronically "may not have contained copies of the seals
or signatures."  See Abraham Supp. at 3.  The Court has not received a paper or electronic version of the
signed and notarized testimony.

[9] Abraham explains that he did not contact Kennegeisser because the FTC previously accused him and
Kennegeisser of violating the Court's stipulated preliminary injunction and he "fear[ed] further
allegations by the plaintiff."  See Abraham Supp. at 5.  However, this is no excuse for his failure to submit
an affidavit from her because the Court found that the he and Kennegeisser did not violate the terms of
the stipulated preliminary injunction, and nothing in the Court's order prevented him from
communicating with or procuring testimony from her.  See Order (Dkt. No. 42).

Gottlieb, 84 F.3d at 518.  He has presented no affirmative evidence to support his assertions, and "the mere existence of some alleged factual dispute between the parties alone will not defeat a properly supported motion for summary judgment."  See Garnett-Bishop v. New York Cmty. Bancorp, Inc., No. 12-cv-2285, 2014 WL 4700222, at *5 (E.D.N.Y. Sept. 22, 2014) (internal quotations and citations omitted).  "In the face of [the FTC's] well-supported summary judgment motion, [Abraham's] conclusory denials are insufficient to create a disputed issue of material fact" as to whether Defendants made material misrepresentations to consumers.  See Soares v. Univ. of New Haven, 154 F. Supp. 2d 365, 376 (D. Conn. 2001).  Summary judgment is therefore granted to the FTC on Count One.

C.  The TSR

Counts Two through Four allege violations of the TSR.  Any violation of the TSR is deemed a "deceptive act or practice" in violation of Section 5(a) of the FTC Act.  15 U.S.C. § 6102(c); 16 C.F.R. § 310.1.  There is no question, and Abraham does not dispute, that Defendants are "sellers" or "telemarketers" that engaged in "telemarketing" and are thus subject to the TSR.[10]

1.  False or Misleading Statement to Induce Payment

The FTC claims that Abraham violated the TSR by making false or misleading statements to induce consumers to pay for goods or services.  See FTC Memorandum in Support of its Motion for Summary Judgment ("Memorandum") at 19; 16 C.F.R. §

---

10 The TSR was promulgated to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102 et seq., which defines "telemarketing" as a "plan, program, or campaign which is conducted to induce purchases of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call."  15 U.S.C. § 6106(4).  Telemarketer "means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."  16 C.F.R. § 310.2(cc).  Seller "means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."  Id. § 310.2(aa).

310.3(a)(4).  As discussed <u>supra</u>, Section II.B., the FTC has established that there is no genuine dispute of material fact that Defendants, in an effort to induce payment, made misleading statements that consumers had ordered the IRS medical alert services and owed money.  Thus, summary judgment is granted to the FTC on this claim.

### 2.  *Threats or Intimidation to Coerce Payment*

The FTC claims that Defendants violated Section 310.4(a)(1) of the TSR by engaging in the use of threats and intimidation to coerce consumers into making a payment.  Memorandum at 19-20.  FTC regulations define "threats and intimidation" to include "repeated calls to an individual who has declined to accept an offer" and "bodily injury and financial ruin and threats to ruin credit, . . . acts which put undue pressure on a consumer, or which call into question a person's intelligence, honesty, reliability, or concern for family."  <u>See</u> TSR, 60 Fed. Reg. 30406-01, 30415 (June 8, 1995 (codified at 16 C.F.R. Part 310)).

There is no genuine dispute of material fact that Defendants, in phone calls and letters, repeatedly threatened consumers with lawsuits and ruined credit if they did not pay IRS.  <u>See</u> <u>supra</u>, Section I.B.  Defendants intimidated consumers in letters by impugning the consumers' honesty and reliability.  <u>See, e.g.</u>, PX 32.3 at 13 ("Shockingly, you broke your word and refused to pay, ignoring our many calls. . . .You ought to be ashamed and embarrassed"); PX 32.2 at 111 (FTC 0000478) ("You have lost our confidence entirely").  They also made repeated phone calls to consumers even after these consumers declined to purchase services during the first solicitation.  <u>See</u> FTC SOF ¶¶ 36-37; 60 Fed. Reg. 30406-01, 30415.

Abraham offers no admissible evidence to support his assertion that Defendants did not threaten or intimidate consumers.  For the reasons discussed above, he cannot

rely on Dumitras' unsworn, inadmissible testimony that "[a]llegations of threats made by IRS agents are total fabrications" because she "never heard an IRS agent make a threat."  <u>See</u> Response at 12; Dumitras Testimony at 13.  As for alleged threats made over the phone, Abraham argues that he "find[s] it difficult to believe that someone can behave in a threatening manner by phone."  Abraham SOF at 33.  And in response to the IRS letters demanding payment, he merely states that "the advice to them to consult an attorney . . . was not intended as a threat" and that "[t]he Court can decide if these are threats, or simply an honest merchant trying to collect a legitimate debt after months of being ignored."  Abraham Supplement at 8; Abraham SOF at 35.  The calls and letters were indeed threats, Abraham's frivolous assertions notwithstanding.  Without admissible evidence to support his position, he cannot properly assert that a genuine issue of material fact exists as to this claim.  <u>See</u> Rule 56(c); <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1012 (2d Cir. 1996).  The Court therefore grants summary judgment to the FTC on Count Three of its Complaint.

### 3.  *Violation of Do Not Call Registry*

The TSR created the National Do Not Call Registry ("Registry"), which allows consumers to opt out of receiving marketing calls by placing on a registry their phone numbers that telemarketers are prohibited from calling.  <u>See</u> 16 C.F.R. § 310.4 (b)(iii)(B); <u>FTC v. Navestad</u>, No. 09-CV-6329T, 2012 WL 1014818, at *4 (W.D.N.Y Mar. 23, 2012).  The FTC claims that Defendants violated the TSR by initiating outbound telephone calls to numbers on the Registry without consumers' prior written authorization or an "established business relationship."  <u>See</u> Memorandum at 21.[11]

---

[11] The TSR defines "established business relationship" as a relationship between a seller and a consumer based on: (A) the consumer's purchase, rental, or lease of the seller's goods or services in a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the

The FTC has established that it is entitled to summary judgment on this claim.  It provided declarations from consumers whose numbers were on the Registry and who received calls without having given IRS prior written authorization to make them or having a prior established business relationship with IRS.  FTC SOF ¶¶ 11, 13.  In response, Abraham does not deny that he lacked written permission from consumers (see Response at 19), and admits that he never confirmed whether the numbers called were filtered out numbers from the Registry.  PX 1 at 180:17-182:7.  Instead, he argues that an established business relationship did exist and is "obvious" because "IRS' salespeople only called consumers who were recorded requesting information about IRS services."  Response at 19.  Abraham has provided no admissible evidence—such as the alleged recordings or the testimony of an IRS salesperson—to support his assertion.  Thus, there is no a genuine issue of material fact to be tried regarding the absence of a prior established business relationship between consumers and IRS, and summary judgment on Count Four is granted to the FTC.

 D. <u>Unordered Merchandise Statute</u>

In its fifth and final claim, the FTC alleges that Defendants violated the Unordered Merchandise Statute ("UMS"), which prohibits the mailing of unordered merchandise to consumers, as well as any attempt to collect payment for that merchandise.  39 U.S.C. § 3009(a), (c).  Under the UMS, the mailing of unordered merchandise constitutes a <u>per se</u> violation of Section 5 of the FTC Act.  <u>Id.</u>

The FTC is entitled to summary judgment on this claim.  It submitted complaints and declarations from consumers or their caretakers, which state that Defendants

---

date of a telemarketing call; or (B) the consumer's inquiry or application regarding a product or service offered by the seller within the three (3) months immediately preceding the date of the telemarketing call. 16 C.F.R. § 310.2(o).

mailed unordered merchandise to them and attempted to collect payment for that merchandise.  See FTC SOF ¶ 33; PX 35 at FTC-IRS_00522-31.  Abraham provides no admissible evidence in response.  He asserts that "IRS never sent any consumer unordered merchandise" because it "would be financially insane to do so" and "everybody who was sent IRS equipment had subscribed and agreed to pay for that subscription."  Response at 54.  Such unsupported assertions cannot create a genuine issue with respect to the material facts set forth in the numerous declarations and complaints that the FTC submitted.  See Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010).  Summary judgment is therefore granted to the FTC on Count Five of its complaint.

   E.  Liability of Abraham for Acts of IRS

       1.  Liability for Injunctive Relief

   To obtain injunctive relief against an individual for a corporate defendant's violations, the FTC must show that the individual (1) participated directly in the corporate defendant's deceptive acts or practices or (2) had the authority to control them.  See FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1202 (10th Cir. 2005).  Assuming the duties of a corporate officer establishes authority to control.  FTC v. Amy Travel Serv., Inc., 875 F. 2d 564, 573-74 (7th Cir. 1989).  The FTC is not required to show intent to deceive to obtain injunctive relief against an individual.  See FTC v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000).

    The requirements for individual liability for injunctive relief are clearly met here.  Abraham does not dispute the FTC's allegations regarding the scope of his control and involvement in his company's business affairs.  Indeed, he admits that he was the sole owner and officer of IRS and directed or participated in most of its practices.  FTC SOF

¶¶ 3, 55-71, 73-74, 80-93.  He wrote the letters to consumers that demanded payment for unordered services.  Id. ¶¶ 92-93.  He was also responsible for hiring, training, and overseeing telemarketers, including Kennegeisser, who threatened consumers.  Id. ¶¶ 83, 86.  Thus, there is no genuine dispute of material fact that Abraham had authority to control IRS and participated directly in many of the company's deceptive acts and practices.  The FTC has established Abraham's liability for injunctive relief, and the Court grants summary judgment enjoining him on terms as are discussed infra, Section II.F.1 and set forth in the attached Order.

### 2.  Liability for Monetary Relief

To hold an individual liable for monetary relief, the FTC must show that the individual "had or should have had knowledge or awareness of the misrepresentations." Amy Travel, 875 F.2d at 573.  The knowledge requirement may be satisfied by showing that the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth."  Five-Star Auto, 97 F. Supp. 2d at 535 (quoting Amy Travel, 875 F.2d at 574).  Active involvement in the day-to-day operations of a company as well as awareness of consumer complaints is probative of knowledge.  Amy Travel, 875 F.2d at 573-75.

The FTC presented unrebutted evidence that Abraham was intimately involved in IRS' daily operations and was aware of at least 100 consumer complaints.  See FTC SOF ¶¶ 55-71, 73, 93, 98-101, 104.  Thus, there is no genuine dispute of material fact that Abraham had, at the very least, "an awareness of a high probability of fraud along with an intentional avoidance of the truth," see Five-Star Auto, 97 F. Supp. 2d at 535.  Therefore, he is individually liable for restitution.

F.  Remedy

    1.  *Injunctive Relief*

The FTC requests the entry of a permanent injunction and monetary relief pursuant to Section 13(b) of the FTC Act.  See 15 U.S.C. § 53(b) (". . . in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction"). In its revised proposed order, the FTC seeks to permanently enjoin Abraham from (1) engaging in the marketing, promotion or sale of medical alert goods or services; (2) making any material misrepresentation in connection with promoting or selling any goods or services; (3) violating the Unordered Merchandise Statute; and (4) collecting payment for any medical alert good or service.  See Dkt. No. 76.

The FTC has demonstrated that a permanent injunction against Abraham is warranted, if not compelled.  Section 13(b) permits a court to issue a permanent injunction for the violation of any law enforced by the FTC.  See, e.g., FTC v. Minuteman Press, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998).  "Permanent injunctive relief is appropriate when there is 'some cognizable danger of recurring violation.'"  FTC v. Medicor LLC, 217 F. Supp. 2d 1048, 1057 (C.D. Cal. 2002).  Factors to consider in determining whether such danger exists include:  defendant's scienter, whether the conduct was isolated or recurrent, whether defendant is positioned to commit future violations, the degree of consumer harm caused by defendant, defendant's recognition of his culpability, and the sincerity of defendant's assurances (if any) against future violations.  See Minuteman Press, 53 F. Supp. 2d at 260-61.

As discussed above, Abraham knowingly made misrepresentations to hundreds of consumers over a five-year period, all while subject to a permanent injunction issued in 2003 by the United States District Court for the District of Columbia, which prohibited

such conduct.  Abraham's disregard for the terms of that injunction portends a "recurring violation."  See Medicor, 217 F. Supp. 2d at 1057.  Furthermore, the Court finds that the FTC's proposed order for a permanent injunction is "narrowly tailored to fit [Abraham's] specific legal violations" and does not "impose unnecessary burden[s] on lawful activity," such as lawful and legitimate telemarketing.  See Waldman Publ'g Co. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994).  The Court will therefore enter a permanent injunction against Abraham, the terms of which are set forth in the attached Order.

### 2.  Monetary Relief

The FTC seeks an order providing for a monetary judgment of $3,432,462 against Abraham, which it alleges is the amount of revenues he received through his company's unlawful scheme.[12]  It also seeks to require third parties holding Abraham's frozen assets to surrender the assets to the FTC in partial satisfaction of the monetary judgment.  See Five-Star Auto, 97 F. Supp. 2d at 533 ("[Section 13(b)'s] grant of permanent injunctive power gives the court broad equitable authority to grant any ancillary relief necessary to accomplish complete justice").  Before a court may order restitution under Section 13(b), the FTC must establish a "presumption" of consumer reliance by showing that "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."  Freecom, 401 F.3d at 1205-06.

As discussed supra, Section II.B., Abraham and his company made material misrepresentations through telephone calls and letters that were misleading to a

---

[12] As noted above, the Court entered a default judgment and order against IRS on January 31, 2014, which found the company liable for $3,432,462.  See Dkt. No. 65 at 4.

reasonable consumer.  The misrepresentations were widely disseminated to hundreds of consumers across the nation, and at least some of these consumers eventually purchased IRS' services.

In the Second Circuit, "[t]he appropriate measure for restitution is the benefit unjustly received by the defendants."  Verity, 443 F.3d at 67.  Once the FTC shows that it has "reasonably approximated" Abraham's unjust gains, the "burden shifts to [Abraham] to show that those figures are inaccurate."  Id. at 67 (internal citations omitted).

The FTC has shown that the $3,432,462 in IRS' total gross revenues is a "reasonable approximation" of Abraham's unjust gains.  Cf. FTC v. Bronson Partners, LLC, 654 F.3d 359, 368-69 (holding that "unjust gains" must be directly connected to the defendant's wrongdoing).  In its Reply to Abraham's Supplemental Response, it provided additional documentation to support its calculations:  the corporate financial statement for IRS that Abraham produced to the FTC on March 15, 2013 and the accounting spreadsheets that he relied on to prepare the statement.  See Abraham Financial Disclosure at 9 (Dkt. No. 78; Exs. A-K).  The Court finds that the FTC has provided sufficient documentation to support its calculation of the $3,432,462 in monetary relief that it seeks.

At the November 12, 2014 conference, Abraham agreed to the amount of monetary relief that the FTC requests.  In his Supplemental Response, however, he seeks to refer the matter to a magistrate judge to "conduct a hearing to adjust the amount to a fair assessment" because he now realizes that "if the Plaintiff prevails, [he] will have the moral and ethical obligation to pay as much of this award as [he] is able."  See Abraham Supp. at 11.  He still has not contested the accuracy of the amount of

monetary relief that the FTC seeks, despite numerous opportunities to do so.  Thus, a

hearing on this issue is not warranted.

## CONCLUSION

The FTC's motion for summary judgment is GRANTED as to all claims.  The

Court will issue a permanent injunction against Abraham as well as an order granting

$3,432,462 in monetary relief against him.

SO ORDERED.


Dated:          Brooklyn, New York
                April 14, 2015


                                        /s/_____
                                        I. Leo Glasser
                                        Senior United States District Judge